**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Derrick L. Span,<br><br>        Plaintiff,<br><br>v.<br><br>Pinal County Community College District,<br><br>        Defendant. | No. CV-23-02233-PHX-JJT<br><br>**ORDER** |

At issue is Defendant Pinal County Community College District's Motion for Summary Judgment ("Motion") (Doc. 63, MSJ), to which Plaintiff Dr. Derrick Span filed a Response (Doc. 80, Resp.) and Defendant filed a Reply (Doc. 81, Reply). Defendant supports its Motion with a Statement of Facts (Doc. 64, SOF), and Plaintiff supports his Response with a Controverting Statement of Facts (Doc. 74, CSOF). For the reasons set forth below, the Court grants Defendant's Motion.

**I.  BACKGROUND**[1]

In 2011, Plaintiff was hired by Defendant as a full-time professor in the Social and Behavioral Sciences Division ("Division"). (Span Dep. at 19:24–20:4; Span Decl. ¶ 6.) Plaintiff became a "visible advocate for equity and inclusion" at the College by challenging College policies that negatively affected people of color, creating the first diversity and equity committee, advocating for a Chief of Diversity and Equity position within the

---

[1] The following facts are uncontested or—to the extent they are contested—are drawn from Plaintiff's own deposition testimony (SOF at 15–45, Span Dep.), declaration (Doc. 75-1, Span Decl.), and other documents that Plaintiff submitted in response to the Motion.

President's cabinet, organizing a virtual platform to discuss social issues. (Span Decl. ¶¶ 9–10.)

Between 2020 and 2024, Plaintiff served a three-year term as the Division Chair. (SOF ¶ 3; CSOF ¶ 3.) During his tenure, Plaintiff reported directly to Dean Atteberry, who in turn would report to Vice President Gilliland, who then reported to President Elliot. (SOF ¶ 5; CSOF ¶ 5; Span Dep. at 23:9–25:21.) Plaintiff's responsibilities as the Division Chair included "acting as an intermediary between College administration and Division faculty," staffing, programming, scheduling, responding to student concerns and complaints, and supervising faculty. (SOF ¶ 4; CSOF ¶ 4.)

In his time as Division Chair, faculty member Dr. Liz Baroi shared her concerns about Dr. Carol Johnson, another faculty member with whom Plaintiff shared a friendly and previously romantic relationship. (SOF ¶¶ 27–28; CSOF ¶¶ 27–28.) Plaintiff responded that, per College policy, he was unable to investigate Dr. Johnson for the reasons given by Dr. Baroi because he received no student complaints against her. (SOF ¶ 29; CSOF ¶ 29; Span Dep. at 94:16–96:2.) Plaintiff asked Dr. Baroi to provide him with the student complaints she referenced, but she never did. (Span Dep. at 69:20–71:12.)

While Division Chair, Plaintiff generally experienced his staff "going around him" to the Dean or Vice President to complain about Plaintiff's management or enforcement of College policies. (SOF ¶ 19; CSOF ¶ 19; Span Dep. at 37:10–17.) The evidence provided by Plaintiff shows that this issue predated March 10, 2020.[2] Plaintiff was also concerned about the Division being assigned the color brown on the College's website and being called the "Brown division." (SOF ¶¶ 64–67; CSOF ¶¶ 64–67.) That color was coded to the Division as a part of the College's "Guided Pathways" process, which streamlined the students' graduation process and color coded each area of study. (Span Dep. at 55:20–56:1.) According to Plaintiff, this color coding occurred "somewhere again around 2020 or

---

[2] Dr. Dawn Conley, one of Plaintiffs' direct reports, submitted her own internal complaint on November 6, 2019. In the written investigation report dated March 10, 2022, the investigator documented that Dr. Conley complained of another staff member circumventing Plaintiff—who was Dr. Conley's direct supervisor—to raise concerns directly to College leadership. (Doc. 75-6 at 6.)

2021." (Span Dep. at 56:2–7.) The choice of color was "stereotypical" because Plaintiff is an African American man and the Division had the highest concentration of minorities. (Span Dep. at 48:22–50:3, 60:10–25.) Plaintiff directly heard one person refer to the Division as the "Brown Division" and believed an anonymous survey comment referencing "Brown people" was directed towards the Division because of its assigned color. (SOF ¶¶ 66–68; CSOF ¶¶ 66–68; Span Dep. at 50:10–14, 54:10–20, 52:8–15.) He raised his concerns to leadership about the color "for some two years, close to three years," but nothing changed during his tenure as the Division Chair. (Span Dep. at 49:18–20.) Around this time, Plaintiff knew of other lawsuits brought by his African American colleagues asserting racial discrimination, but he refused to join in those lawsuits because he did not feel personally affected. (Span Dep. at 66:14–25.)

On October 21, 2021, the Dean and Vice President informed Plaintiff that the Dean would become involved in the Division to improve visibility of the program. (Span Decl. ¶ 14; Doc. 75-1; Doc. 76-5.) Plaintiff was told that the Division would be the "guinea pig" for the new initiative. (SOF ¶¶ 14–16; CSOF ¶¶ 14–16.) He expressed concern that this would make it look like he was not able to do his job and would further weaken his authority over faculty members. (SOF ¶ 19; CSOF ¶ 19; Span Decl. ¶ 17.)

On October 26, 2021, Dr. Baroi emailed the Vice President and two students detailing those students' complaints about Dr. Johnson's teaching abilities. (Doc. 77-1 at 4.) The students responded to the email chain confirming Dr. Baroi's account. (*Id.* at 2–3.) Plaintiff was not included in these emails.

On October 27, 2021, the Dean and Vice President met with Plaintiff and four faculty members that directly reported to Plaintiff. (Span Decl. ¶ 18.) At the meeting, Plaintiff asked "why the Social & Behavioral Sciences Division was singled out for their intervention" and purportedly received criticism in response for his "objections." (*Id.* at ¶ 19.)

On October 28, 2021, Dr. Baroi sent an email to the Dean and Plaintiff that "welcomed" the Dean to the Division and detailed concerns she had with instructors who

taught introductory psychology courses at the college. (Doc. 76-6; Span Decl. ¶ 20.) According to Plaintiff, Dr. Baroi's concerns targeted Dr. Johnson. (Span Decl. ¶¶ 20–21.)

Around this time, Plaintiff met with the President and voiced his concerns about his staff "going around" him, the assignment of the color brown to the Division, and the pending lawsuits of other College employees. (SOF ¶¶ 8–10; CSOF ¶¶ 8–10; Span Decl. ¶¶ 22–23.) Shortly afterwards, the Dean called Plaintiff to ask why he met with the President and whether he raised any concerns he had with the Dean or Vice President, to which Plaintiff said he did not. (SOF ¶¶ 11–12; CSOF ¶¶ 11–12; Span Decl. ¶¶ 24–25.) During the same conversation, the Dean asked Plaintiff to investigate the "Blackboard account"—an institutional platform used by faculty—of Dr. Johnson because there were some student complaints against her. (SOF ¶ 13; CSOF ¶ 13.) Plaintiff responded that he knew of no complaints against Dr. Johnson, so he had no reason to investigate her. (Span Dep. at 72:13–73:10.) After his meeting with the President, the Dean conducted less frequent meetings with Plaintiff as opposed to his colleagues who were having frequent or monthly meetings with their respective dean. (SOF ¶ 58; CSOF ¶ 58; Span Dep. at 62:9–24.)

On November 29, 2021, Dr. Baroi sent an email only to the Dean and Vice President with the subject line "Updated information regarding current investigation." (Doc. 77-2 at 4.) Dr. Baroi listed numerous complaints against Plaintiff, including that he instructed her against raising concerns about Dr. Johnson to the Dean or Vice President and against issuing course evaluations. (*Id.*) The same day, the Vice President responded to Dr. Baroi and copied Plaintiff, stating, "I'm concerned that [Plaintiff] told you specifically not to go to the Dean or the VP . . . If you have concerns, and he doesn't agree, I think it is valid to bring them forward." (*Id.* at 3.) Plaintiff then responded that he was "shocked" to learn that there was "apparently some investigation of me in my division." (*Id.* at 2.)

Soon after this email exchange, Plaintiff filed a harassment and discrimination complaint form and an incident reporting form ("Internal Complaint") against the Dean, Vice President, and Dr. Baroi, claiming they were "involved in this unwarranted and

1  provocative investigation [that] involves racism and gender discrimination." (SOF ¶¶ 39–
2  40; CSOF ¶¶ 39–40.) In his Internal Complaint, Plaintiff requested "[n]o supervisory
3  interaction between me and the Dean." (SOF ¶ 41; CSOF ¶ 41.) After filing the Internal
4  Complaint, the Dean stopped conducting monthly meetings with Plaintiff altogether. (Span
5  Dep. at 63:1–5.)

6        Plaintiff submitted his Internal Complaint during a time in which the College's
7  Chief of Police, Gregory Roberts, oversaw the functions of the Human Resources
8  department due to a staffing vacancy. (SOF ¶ 42; CSOF ¶ 42.) Chief Roberts assigned the
9  Internal Complaint to Laura Arnold, a police technician within the College. (SOF ¶ 43;
10  CSOF ¶ 43.) On March 24, 2022, Ms. Arnold emailed Plaintiff notifying him that she
11  received the investigation packet and "hope[s] to schedule an interview with [Plaintiff] in
12  the next couple of weeks." (Doc. 78-7.)

13        On April 7, 2022, Plaintiff filed a charge of discrimination with the Equal
14  Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the
15  Civil Rights Act of 1964, specifically alleging discrimination based on race. (Doc. 78-6.)
16  Plaintiff describes the November 29, 2021 email exchange regarding the "secret
17  investigation," the assignment of the color brown to the Division, the lack of supervisory
18  meetings since filing his Internal Complaint, and the inadequate investigation of his
19  Internal Complaint as the grounds for his EEOC Charge. (*Id*. at 3.)

20        On April 20, 2022, Plaintiff emailed Ms. Arnold regarding ongoing issues with
21  Dr. Baroi routing student complaints directly to Vice President Gilliland rather than to him.
22  (Doc. 77-4 at 2.) Ms. Arnold responded that she added his email to his file and noted that
23  she "would still need to get some times when it would be convenient for [Plaintiff] and
24  [her] to speak . . ." (*Id.*) Plaintiff subsequently responded with his ongoing availability for
25  an interview. (Doc. 78-4 at 2.) Ms. Arnold responded several days later but did not schedule
26  an interview with Plaintiff. (*Id.*) Aside from these emails, no other evidence by either party
27  is offered to show additional contact between Ms. Arnold and Plaintiff.
28  . . .

Later, Ms. Arnold authored a three-page preliminary investigation report based on her review of certain emails, Plaintiff's Internal Complaint, and written responses from the Vice President and Dr. Baroi. (Doc. 78-5 at 2.) Ms. Arnold sent the preliminary report on July 27, 2022 to Chief Roberts and noted that it was "not submitted yet, as [she] needed to talk with Dr. Span." (*Id.*) A copy of the preliminary report was not provided to Plaintiff until it was attached in Defendant's position statement in response to Plaintiff's EEOC Charge. (SOF ¶ 49; CSOF ¶ 49.) Neither party suggests that the investigation into Plaintiff's Internal Complaint was formally closed.

In or around December 2022, the Dean passed away. (Span Dep. at 63:6–22.) The College opened the dean position and Plaintiff applied. (Span Decl. ¶ 34.) Plaintiff inquired whether it was possible to report to someone else other than the Vice President if he was offered the position, given that his Internal Complaint was still pending against her. (*Id.* ¶ 37.) The College answered in the negative, and Plaintiff withdrew his application. (*Id.* ¶¶ 37–38.) Plaintiff went on to apply to another dean position that reported to a different vice president and was denied that position. (*Id.* ¶ 38.) Plaintiff completed his third term as the Division Chair and decided to not run for that position again. (Span Dep. at 25:22–27:12.) He remains a full-time professor in the Division. (Span Dep. at 19:24–20:4.)

On July 28, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. (Doc. 1, Compl., ¶ 11.) On October 27, 2023, Plaintiff filed suit in this Court alleging two violations of Title VII for disparate treatment based on his race and retaliation.[3] (*Id.* ¶¶ 38–48.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA,*

---

[3] Plaintiff also brought a Title VII claim for hostile work environment as Count One but now stipulates to dismiss that claim (Resp. at 16 n.2).

- 6 -

1  *LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
2  242, 248 (1986)). The court must view the evidence in the light most favorable to the
3  nonmoving party and draw all reasonable inferences in the nonmoving party's favor.
4  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). "The Court need not 'comb
5  the record' looking for other evidence; it is only required to consider evidence set forth in
6  the moving and opposing papers and the portions of the record cited therein." *New Leaf
7  Publ'g, Inc. v. Top Innovations LLC*, No. 2:24-cv-04676-MEMF-SSC, 2025 U.S. Dist.
8  LEXIS 208363, at *5 (C.D. Cal. Oct. 21, 2025) (citing Fed. R. Civ. P. 56(c)(3), (e)(2);
9  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

10  The moving party "bears the initial responsibility of informing the district court of
11  the basis for its motion, and identifying those portions of [the record] . . . which it believes
12  demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232.
13  When the moving party does not bear the ultimate burden of proof, it "must either produce
14  evidence negating an essential element of the nonmoving party's claim or defense or show
15  that the nonmoving party does not have enough evidence of an essential element to carry
16  its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*,
17  210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party does so, the nonmoving party
18  must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is
19  appropriate against a party that "fails to make a showing sufficient to establish the existence
20  of an element essential to that party's case, and on which that party will bear the burden of
21  proof at trial." *Celotex*, 477 U.S. at 322.

22  In considering a motion for summary judgment, the court must regard as true the
23  nonmoving party's evidence if it is supported by affidavits or other evidentiary material.
24  *Anderson*, 477 U.S. at 255. The nonmoving party may not merely rest on its pleadings; it
25  must produce some significant probative evidence tending to contradict the moving party's
26  allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the
27  plaintiff must present affirmative evidence to defeat a properly supported motion for
28  summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A

summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.") (internal citation omitted).

## III. DISCUSSION

### A. Disparate Treatment

Plaintiff brings a claim for disparate treatment under Title VII, alleging Defendant discriminated against him because of this race and color under 42 U.S.C. § 2000e-2(a). (Compl. ¶¶ 38–43.) Title VII makes it unlawful for an employer "to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race or color. 42 U.S.C. § 2000e-2(a).

Disparate treatment claims require the plaintiff to prove that the employer acted with conscious intent to discriminate against the plaintiff based on his protected characteristic. *Costa v. Desert Palace*, 299 F.3d 838, 854 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003). At this stage, a plaintiff need only make a prima facie case "established by proof of facts supporting an inference of intentional discrimination." *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 538 (9th Cir. 1982). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). This initial burden of production "is met upon a showing of actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon race or another impermissible criterion." *Gay*, 694 F.2d at 538. "Evidence can be in the form of the *McDonnell Douglas* prima facie case, or other sufficient evidence—direct or circumstantial—of discriminatory intent." *Costa*, 299 F.3d at 855. "[T]he court must make a sensitive inquiry into the direct and circumstantial evidence of

1  discrimination offered by the plaintiff in order to determine if the facts so proved allow a
2  legally-permissible inference of discriminatory intent." *Gay*, 694 F.2d at 538.

3  Direct evidence establishing a prima facie case, "if believed, proves the fact [of
4  discriminatory animus] without inference or presumption." *Vasquez v. Cnty. of Los
5  Angeles*, 349 F.3d 634, 640 (9th Cir. 2006) (modification in original). Circumstantial
6  evidence, on the other hand, requires a fact finder to draw inferences or presumptions of
7  discriminatory intent.

8  A party may evoke the burden-shifting *McDonnell Douglas* framework, which is
9  "the traditional framework for evaluating disparate-treatment claims that rest on
10 circumstantial evidence." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 306 (2025).
11 Under the *McDonnell Douglas* framework, a plaintiff must establish: (1) the plaintiff
12 belongs to a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff
13 was subject to an adverse employment action; and (4) similarly situated individuals outside
14 the plaintiff's protected class were treated more favorably. *McDonnell Douglas Corp. v.
15 Green*, 411 U.S. 792, 802 (1973). While a useful "tool to assist plaintiffs at the summary
16 judgment stage so that they may reach trial, nothing compels the parties to invoke the
17 *McDonnell Douglas* presumption." *Costa*, 299 F.3d at 855.

18 If the plaintiff establishes a prima facie case, the burden shifts to the defendant who
19 must articulate legitimate, non-discriminatory reasons for the challenged action.
20 *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant meets this burden, the plaintiff
21 must finally show that the "reason is pretextual either directly by persuading the court that
22 a discriminatory reason more likely motivated the employer or indirectly by showing that
23 the employer's proffered explanation is unworthy of credence." *Davis v. Team Elec. Co.*,
24 520 F.3d 1080, 1089 (9th Cir. 2008) (internal citation and quotations omitted)).

25        **1.**    *McDonnell Douglas* **Framework**

26 Both parties evoke the *McDonnell Douglas* framework. Defendant does not dispute
27 that Plaintiff can establish the first two elements. (MSJ at 13.) Rather, the parties argue
28 whether Plaintiff can establish a genuine issue of material fact that he was subjected to an

1  adverse employment action or that similarly situated individuals outside his protected class
2  were treated more favorably. (MSJ at 13–14; Resp. at 16–18; Reply at 7–9.)

3  An adverse employment action is one that materially affects the compensation,
4  terms, conditions, or privileges of employment. *Davis*, 520 F.3d at 1089. "Adverse
5  employment actions may include not only actions an employer affirmatively takes against
6  an employee (*e.g.*, firing or demoting the employee) but also situations in which the
7  employer denies an employee a material employment benefit or opportunity that was
8  otherwise available to her," such as the denial of a promotion or a transfer. *Campbell v.*
9  *State Dep't of Educ.*, 892 F.3d 1005, 1013 (9th Cir. 2018). Depriving a person of support
10 services that were previously available to them may also constitute an adverse employment
11 action. *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (citing *Knox v. Indiana*, 93
12 F.3d 1327, 1334 (7th Cir. 1996)). The harm from an employment action need not be
13 significant to be adverse. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357, 357 (2024).
14 Still, actions that are trivial or have no tangible job consequence, such as a reprimand or
15 low performance review without more, may not rise to the level of adverse. *Gildersleeve*
16 *v. City of Sacramento*, No. 2:22-cv-02145-JAM-AC, 2025 U.S. Dist. LEXIS 144069, *6
17 (E.D. Cal. Jul. 28, 2025).

18 Defendant argues that Plaintiff can establish no genuine issue of material fact that
19 he was subjected to an adverse employment action from the College. (MSJ at 13–14.)
20 Plaintiff retorts that he has shown evidence of three adverse employment actions. (Resp. at
21 17.) First, Plaintiff expresses that the Vice President and Dean "grossly interfered with his
22 basic job duties by coming into his division and compromising his ability to succeed in his
23 position as Division Chair." (*Id.*) Neither party disputes that the Dean and Vice President
24 met with Plaintiff and told him that they would be working with his division to "get them
25 out to the school community," or that Plaintiff expressed the involvement would "weaken
26 his authority as the Chair." (SOF ¶ 14–15, 19; CSOF ¶ 14–15, 19.) According to Plaintiff,
27 these events inspired "fear" in him about destabilization of the Division that would "blur
28 college policies regarding chain-of-command, and ultimately undercut his authority."

(Resp. at 9–10.) But Plaintiff sets forth no evidence that his compensation, terms, conditions, or privileges of his position were materially affected by these events. For example, Plaintiff remained in his position as the Division Chair for the remainder of his term (Span Dep. at 25:22–27:12) and maintained the same pay (*see* Doc. 77-4 (email from pay system manager to Plaintiff on December 6, 2021, noting no changes to pay assignment).) Plaintiff even concedes that faculty members were already "going around" him to the Dean and Vice President prior to the Dean's involvement in his Division, which undercuts a finding that any material change occurred. (SOF ¶ 19; CSOF ¶ 19; Doc. 75-6 at 6.)

Second, Plaintiff states that the Vice President and Dean colluded with Dr. Baroi "to solicit student complaints out of the chain of command and undermine his ability to carry out his duties." (Resp. at 17.) It is undisputed that Dr. Baroi emailed the Dean and Vice President directly to "update" them about her conversations with Plaintiff, titling the email "Updated information regarding current investigation." (SOF ¶ 30; CSOF ¶ 30; Doc. 77-2.) While Plaintiff claims that the Vice President unintentionally copied Plaintiff on the email that alerted him to the "secret investigation," Plaintiff admits that claim is "pure speculation." (Span Dep. at 43:15–45:11.) Speculation without more is insufficient to defeat a motion for summary judgment. *Taylor*, 880 F.2d at 1045. Plaintiff also fails to produce evidence that this secret investigation materially affected aspects of his job. As discussed above, the record indicates that Plaintiff maintained his position, pay, and responsibilities relative to what he had prior to the "secret investigation." (SOF ¶ 19; CSOF ¶ 19; Span Dep. at 25:22–27:12; Doc. 77-4.)

Third, Plaintiff asserts that the College assigning his Internal Complaint to campus police and leaving "that investigation open indefinitely" constitutes an adverse employment action because it "constructively render[ed] him permanently ineligible for promotion." (Resp. at 17.) Plaintiff offers evidence that his colleagues Dr. Dawn Conley and Ms. Veronika Mosley, both of whom are African American women who filed an internal complaint for racial discrimination, were subjected to an investigation process

conducted by a third-party company that included a direct interview and a complete report. (Docs. 75-6, 76-1). Plaintiff's complaint, on the other hand, was investigated internally (*see* Doc. 78-2), the investigator failed to interview him despite Plaintiff's attempts to share his availability (*see* Doc. 78-4), and did not result in a formal, complete report. The Court need not determine whether this internal investigation constituted an adverse employment action, though, because Dr. Conley and Ms. Mosley are both African American and belong to the same protected class as Plaintiff.[4] Therefore, this action, even if adverse, does not survive the fourth element of the *McDonnell Douglas* framework.

The only other change in his employment conditions identified by Plaintiff was the cessation of meetings with the Dean after he filed his Internal Complaint. (Span Dep. at 64:23–65:3; Doc. 78-6.) According to Plaintiff, these meetings are "crucial" to advance into a deanship. (Span Dep. at 62:9–63:5.) However, it is undisputed that Plaintiff requested "no supervisory interaction" with the Dean (SOF ¶ 41; CSOF ¶ 41), and Plaintiff provides no evidence or testimony that he sought out other supervisory support as the Division Chair and was denied. Plaintiff also does not attribute his promotion ineligibility to the reduction of supervisory meetings; rather, he attributes it to the incomplete investigation of his Internal Compliant. (Resp. at 17.) Therefore, the reduction of supervisory meetings is immaterial to whether Plaintiff was "constructively render[ed] permanently ineligible for promotion" and does not constitute an adverse employment action.

### 2. Other Circumstantial Evidence

While Plaintiff does not establish a prima facie case under the *McDonnell Douglas* framework, he may set forth other circumstantial evidence of discriminatory intent. *Costa*,

---

[4] To the extent Plaintiff's disparate treatment claim raises gender-based discrimination, the Court lacks subject matter jurisdiction to consider it. *Vasquez*, 349 F.3d at 644 ("To establish subject matter jurisdiction over his Title VII retaliation claim, [the plaintiff] must have exhausted his administrative remedies by filing a timely charge with the EEOC."). Nowhere in his EEOC Charge (Doc. 78-6) or Complaint does Plaintiff allege gender-based discrimination. While subject matter jurisdiction may extend "over all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002), there is no evidence or argument from Plaintiff suggesting that gender-based discrimination fell within the scope of the EEOC's actual investigation or was reasonably expected to grow out of the EEOC Charge that exclusively alleged race-based discrimination.

299 F.3d at 854. Plaintiff asserts that he "has produced substantial circumstantial evidence of discriminatory intent," which includes evidence of: (1) a "lengthy history of discriminating against African American faculty and staff" by the College; (2) Plaintiff's "long history of raising concerns of discrimination at [the College]"; (3) the College's targeted interference and disruption of the Division; and (4) the College's inadequate investigation of Plaintiff's Internal Complaint. (Resp. at 18.) The result was "Dr. Span's career [being] in perpetual limbo—unable to advance to any Academic Dean position without forcing direct oversight by the target of his unresolved grievance." (*Id.*)

Plaintiff offers his testimony that he had a long history of challenging discriminatory policies of the college (Span Decl. ¶ 9), which included contesting the College's assignment of the color brown to the Division. These advocacy efforts, however, were "never met with direct action against" him. (*Id.* ¶ 13.) In fact, despite his distinct advocate role at the College, he did not personally experience disparate treatment before Fall of 2021 and even refused to join his colleagues' racial discrimination lawsuits "because at that time I had nothing that I felt happen to me specifically." (Span Dep. at 66:22–25.) Those lawsuits that Plaintiff refused to join, each of which settled short of trial (Docs. 76-2, 76-4), arose from internal complaints filed by African American women that were closed by a third-party investigator who found no credible evidence of discriminatory motives (Doc. 75-6 at 17, 42, 45, 47; Doc. 76-1 at 3). Plaintiff does not attempt to construe these events as evidence of discrete discriminatory acts against him—nor could he. The lawsuits do not involve him at all, and Plaintiff could recall no obstruction of or consequence for his earlier advocacy efforts. At most, this evidence serves only as relevant background evidence[5] to put Plaintiff's disparate treatment claims in context. *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002) (a plaintiff may use "the prior acts as background evidence in support of a timely claim" under Title VII). When viewed in a light most favorable to Plaintiff, this

---

[5] Defendant argues that this evidence is "plainly inadmissible" and should not be considered. (Reply at 5.) Evidence of discrimination that is untimely for a Title VII action may be used as background evidence so long as it is admissible. *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002). The Court need not reach the issue of admissibility, however, because Plaintiff ultimately fails to establish a prima facie case of disparate treatment even with consideration of this background evidence.

- 13 -

1  background evidence shows that the College had a history of being accused of racial
2  discrimination and that the College's policies and programming could be improved—and
3  were improved by Plaintiff—to be more equitable to people of color. But it does not show
4  that the College did, in fact, discriminate against its staff based on race.

5  While not present in his EEOC Charge, Plaintiff now argues that the College's
6  disparate treatment of him began with the Dean and Vice President "targeting" the Division
7  to be a "guinea pig" for a new program designed to promote the Division to the
8  community.[6] (Resp. at 18; Span Decl. ¶¶ 13–17.) According to Plaintiff, this action was
9  taken because Plaintiff is African American. (Span Dep. at 48:22–49:8.) However, the
10 Court cannot make that inference from the simple fact that the Division happened to be
11 selected as the first to try the College's new program, especially when Plaintiff admits that
12 he experienced no direct action or disparate treatment personally prior to this event. (Span
13 Decl. ¶ 13; Span Dep. at 66:22–25.)

14 As described in his EEOC Charge, Plaintiff's disparate treatment claim more
15 directly arises from the November 29, 2021 email chain started by Dr. Baroi, which
16 purportedly shows that the College led a "secret investigation" against him. (Doc. 78-6 at
17 3.) However, according to Plaintiff himself, Dr. Baroi was the "architect" of the secret
18 investigation—not the Dean or Vice President—and was targeting Plaintiff because of the
19 way he responded to Dr. Baroi's concerns about Dr. Johnson. (Span Dep. at 69:7–72:8.)
20 As discussed earlier, Plaintiff offers no evidence that the Dean or Vice President were
21 involved in Dr. Baroi's "secret investigation," and admits that claim is "pure speculation."
22 (Span Dep. at 43:15–45:11.) Even assuming the College led this secret investigation,
23 Plaintiff's only evidence that this action was based on race was that he was one of a few
24 African American faculty at the school. (Span Dep. at 74:3–23; SOF ¶ 25; CSOF ¶ 25.)

---

[6] Plaintiff does not address whether this action "fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002). Therefore, it is unclear whether this action is properly within the ambit of this Court's review. Still, the Court will view this evidence in the light most favorable to Plaintiff and draw all reasonable inferences in his favor. *Torres*, 648 F.3d at 1123.

- 14 -

This conclusory allegation, without more, is insufficient to defeat a motion for summary judgment. *Taylor*, 880 F.2d at 1045.

Plaintiff also asserts that the way his Internal Complaint was handled amounts to circumstantial evidence of discriminatory intent based on his race. From Plaintiff's perspective, his internal complaint should have included an interview of Plaintiff, been investigated by a third-party, and formally closed. (Resp. at 14–15.) Even assuming that the investigation was insufficient, Plaintiff's own evidence refutes the presence of discriminatory intent. That evidence includes copies of the finalized, third-party investigation reports of his African American colleagues' complaints, which are the kind of investigation that Plaintiff believes should have been afforded to him. (Docs. 75-6, 76-1.) It cannot be inferred from these facts that the College's insufficient investigation of Plaintiff's Internal Complaint was more likely than not based on his race. *Gay*, 694 F.2d at 538.

In sum, evidence of the College's actions, which include its selection of the Division for a new program, "secret investigation" of Plaintiff, and inadequate investigation of Plaintiff's Internal Complaint, do not give rise to a reasonable inference of unlawful discrimination even when combined with the background evidence of Plaintiff's colleague's lawsuits against the College. After viewing this evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in his favor, *Torres*, 648 F.3d at 1123, Plaintiff cannot establish a prima facie case of disparate treatment and Defendant is entitled to summary judgment on this claim.

### B. Retaliation

Plaintiff brings a claim of retaliation under Title VII, 42 U.S.C. § 2000e-3, alleging that Defendant retaliated against him after notifying College leadership about alleged racial discrimination. (Compl. ¶¶ 44–48.) Under the retaliation provision of Title VII, "an employer may not take action against an employee for bringing or aiding a Title VII charge." *Muldrow*, 601 U.S. at 357 (citing 42 U.S.C. § 2000e-3). This provision "applies only when the retaliatory action is materially adverse, meaning that it causes significant

harm." *Id*. (citation and quotation marks omitted). This standard is intended "to capture those (and only those) employer actions serious enough to dissuade[ ] a reasonable worker from making or supporting a charge of discrimination . . . If an action causes less serious harm . . . it will not deter Title VII enforcement; and if it will not deter Title VII enforcement, it falls outside the purposes of the ban on retaliation." *Id*. (internal citation and quotation marks omitted.)

Parties may evoke the *McDonnell Douglas* burden-shifting framework to establish a prima facia case of retaliation. *See Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir. 1986). The *McDonnell Douglas* framework requires a plaintiff to show (1) that he engaged in protected activity; (2) that his employer subjected him to an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Ray*, 217 F.3d at 1240. If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* And if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretext for a discriminatory motive. *Id.*

Here, both parties evoke the *McDonnell Douglas* framework. (MSJ at 14–15; Resp. at 18–19.) Defendant does not dispute that Plaintiff engaged in a protected activity when he filed his Internal Complaint, or when he discussed his concerns about the "Brown Division" issue with the President during their meeting. (MSJ at 15.) Rather, Defendant argues that Plaintiff cannot establish that he suffered an adverse employment action. (MSJ at 15.) For his part, Plaintiff asserts that he suffered three adverse employment actions: (1) "College Administrators interfered in his department and worked with his direct reports to go around him and undercut his authority"; (2) the College "ensured assignment of his complaint to an untrained investigator"; and (3) the College failed to completely investigate his internal complaint, "making it a practical impossibility for him to be promoted to a dean position without a special exception allowing him to report to someone other than Vice President Gilliland." (Resp. at 19.)

. . .

"Not every employment decision amounts to an adverse employment action," and "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *see also Ray*, 217 F.3d at 1243 ("[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."). The Ninth Circuit "take[s] an expansive view of the type of actions that can be considered adverse employment actions." *Id.* at 1241. "Termination, negative employment references, undeserved negative performance reviews, and denial of promotions qualify as adverse employment actions." *Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 941 (D. Ariz. 2006).

Plaintiff cites to *Chuang v. University of Cal. Davis*, 225 F.3d 1115 (9th Cir. 2000), for the proposition that "actions that impair an employee's ability to satisfactorily perform their jobs, as well as actions that impede an employee's ability to advance in their career" are adverse employment actions. (Resp. at 19.) In *Chuang*, the plaintiff made several requests to be promoted into a position, and was even promised that he would receive that position once it became available. *Id.* at 1124. That position became available numerous times over many years, but each time it was given to someone else. *Id.* at 1125. During this time, the employer forcibly relocated the plaintiff's laboratory, which disrupted his research and resulted in research grants being withheld and experimental subjects being lost. *Id.* at 1125–26.

The employment actions discussed in *Chuang* are markedly different from those identified by Plaintiff here. Unlike the plaintiff in *Chuang* whose work was directly disrupted by the employer's interference in relocating his laboratory, Plaintiff's purported work disruption (*e.g.*, staff "going around him" and undermining his authority) occurred before the College's interference with his Division. (SOF ¶ 19; CSOF ¶ 19; Doc. 75-6 at 6.) Plaintiff was also not promised and subsequently denied a promotion like the plaintiff in *Chuang*. Rather, Plaintiff voluntarily withdrew his application after the College would not make "a special exception" for him to report to someone other than the Vice President.

(Resp. at 19; Span Decl. ¶¶ 34–38.) Plaintiff offers no evidence or testimony that the College represented to him that he would receive a deanship, or that the College had made the exception requested by Plaintiff for others but not for him. Plaintiff also produces nothing more than his opinion that the College was required to obtain a third-party company to investigate his Internal Complaint rather than handle it internally.

Aside from citing *Chuang*, Plaintiff does not elucidate how these three purported employment actions deterred him—or would have deterred other reasonable employees—from engaging in a protected activity. *See Muldrow*, 601 U.S. at 357–58 (discussing deterrence as a critical element of a retaliation claim). The record indicates that Plaintiff was not deterred at all. He voiced his concerns about the College's involvement in his Division multiple times (Span Decl. ¶¶ 17, 19, 22), immediately expressed his discontent to the Vice President about Dr. Baroi's November 29, 2021 email (Doc. 77-2 at 2), promptly filed his Internal Complaint (SOF ¶¶ 37–40; CSOF ¶¶ 37–40), made public statements about his grievances with the College (Doc. 77-7), filed his EEOC Charge without noting any remark or action by the College to obstruct or dissuade him, and applied to two deanships[7] in the time that his Internal Complaint was pending.

For the sake of argument, even if these three employment actions are adverse, Plaintiff fails to set forth evidence supporting the third *McDonnell Douglas* element. First, he broadly refers to his history of advocacy at the College and the fact that he "supervised—and ultimately supported—multiple African American employees" as protected activities. (Resp. at 19.) Plaintiff's advocacy-related activities varied in type and occurred over several years even before he became the Division Chair (Span Decl. ¶¶ 9–10), which makes it impractical for the Court to infer with any level of clarity a causal relationship between those general activities and the employment actions that began in Fall 2021.

Assuming that the protected activity was the filing of Plaintiff's Internal Complaint—which is the only activity Plaintiff mentioned in his EEOC Charge (Doc. 78-

---

[7] Plaintiff separately applied to a deanship that reported to a different vice president within the College and was denied that position. (Span Decl. ¶ 38.) But Plaintiff does not assert that this denial was due to disparate treatment or retaliation, so the Court will not analyze it as such.

- 18 -

6)—Plaintiff does not identify a causal relationship between that activity and any one of the employment actions he listed. Instead, Plaintiff advises the Court that it "need not labor over the third factor: Dr. Span has cited to ample evidence to permit a jury to find a causal relationship between his protected activity and CAC's retaliatory conduct," but does not point out which evidence does so. And while temporal proximity is the customary circumstantial evidence a party uses to establish a prima facie case of causation for retaliation claims, *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865–66 (9th Cir. 2003), Plaintiff does not allude to time as a relevant index at all. "The Court need not 'comb the record' looking for other evidence," *New Leaf Publ'g, Inc.*, 2025 U.S. Dist. LEXIS 208363, at *5, so it ends the inquiry here given Plaintiff's failure to meaningfully set forth his evidence supporting the third *McDonnell Douglas* element.

## IV.     CONCLUSION

Even viewing the evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in his favor, *Torres*, 648 F.3d at 1123, Plaintiff fails to establish a prima facie case of disparate treatment or retaliation under Title VII. Accordingly, the Court will enter summary judgment on Plaintiff's claims in favor of Defendant.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 63).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in Defendant's favor and close this case.

Dated this 19th day of November, 2025.

Honorable John J. Tuchi
United States District Judge